**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Plaintiff, Appellant,**

v.

**BOSTON & MAINE CORPORATION, Defendant, Appellee.**

No. 85–1852.

United States Court of Appeals, First Circuit.

Argued Feb. 5, 1986.

Decided April 9, 1986.

Harold A. Ross, with whom Joseph E. Prekop, Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, Donald J. Siegel, Segal Roitman & Coleman, Boston, Mass., were on brief, for plaintiff, appellant.

Stephen M. Olson, David J. Strasser, James E. Howard, Kirkpatrick & Lockhart, Pittsburgh, Pa., were on brief, for defendant, appellee.

Before COFFIN and ALDRICH, Circuit Judges, PETTINE, Senior District Judge *.

COFFIN, Circuit Judge.

The Brotherhood of Locomotive Engineers (Brotherhood) filed suit in federal court in the District of Massachusetts seeking declaratory and injunctive relief for alleged violations of the Railway Labor Act (RLA), 45 U.S.C. § 151, et seq. (1982), by the Boston & Maine Corporation (B & M). The district court dismissed the case for want of subject matter jurisdiction, ruling that Brotherhood did not raise a "major" dispute under the RLA. Brotherhood appeals that decision and we affirm.

* Of the District of Rhode Island, sitting by designation.

1. As a result, B & M indicated that locomotive engineers operating the unit coal trains would no longer work under the rates of pay, rules, and working conditions as specified in a 1968

### I.

Brotherhood represents employees who have been affected by a change in the operations of B & M in New Hampshire. B & M leased the New Hampshire Lines, a portion of its track, to another railroad, New England Southern Railroad (NES). The New Hampshire Lines run from Manchester, New Hampshire, to Penacook, New Hampshire, spanning twenty-seven miles.

B & M and NES filed a joint petition pursuant to the Interstate Commerce Act (ICA), 49 U.S.C. § 10505, with the Interstate Commerce Commission (ICC) for exemption of the lease transaction. The ICC granted the requested exemption, subject to the employee protective conditions specified in *Mendocino Coast Railway, Inc.— Lease and Operate—California Western Railroad,* 354 I.C.C. 732 (1978), as modified at 360 I.C.C. 653 (1980).

B & M informed Brotherhood that it would make several operational changes because positions on the leased track would now be serviced by NES employees. First, the unit coal trains, which had run from Mechanicville, New York to Concord, New Hampshire would now stop in Bow, New Hampshire, rather than Concord.[1] Second, the length of the East Deerfield, Massachusetts to Concord route (EDCO/COED) was also shortened; Brotherhood members would work on the lines only as far as Manchester, New Hampshire, rather than Concord.[2] Third, B & M abolished the switching assignment at Concord, affecting one employee.

Pursuant to the RLA, Brotherhood served notice on B & M, proposing to revise and supplement the existing collective bargaining agreement to require that all traffic on B & M-owned trackage be serviced by B & M employees, regardless of leasing

collective bargaining agreement. This change affected two employees.

2. As a result, there would be a reduction in the mileage of the EDCO/COED assignment and a corresponding reduction in pay. This change affected two employees.

arrangements. In accordance with RLA requirements, B & M met with Brotherhood to discuss the proposal, but no agreement was reached.

Brotherhood then brought this action, contending that the proposed changes in working conditions were RLA violations, which presented "major" disputes under the Act. It sought a status quo injunction from the district court, enjoining B & M from proceeding with these changes. B & M argued that the district court lacked jurisdiction over Brotherhood's claims for two independent reasons: first, because the relief sought constituted a collateral attack on the ICC order exempting the lease from regulation, and second, because the disputes were "minor" under the RLA. The district court did not address B & M's ICC argument, but agreed with B & M that the disputes were minor.

## II.

■■■ We first review whether the district court was correct in finding that it had no jurisdiction because the disputes were minor. The RLA provides for the resolution of two types of disputes between carriers and labor organizations: major disputes and minor disputes.[3] A major dispute relates to the formation or modification of the collective bargaining agreement, including disputes over rates of pay, rules, or working conditions. *Carbone v. Meserve*, 645 F.2d 96, 98 (1st Cir.1981).[4] If a district court finds the existence of a major dispute, it may enjoin either party from altering the status quo during the course of the negotiated proceedings mandated by section 6 of the RLA. *Detroit & Toledo*

*Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 155, 90 S.Ct. 294, 302, 24 L.Ed.2d 325 (1969).

■■■ A minor dispute contemplates an existing agreement and a disagreement regarding "the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Carbone*, 645 F.2d at 96 (quoting *Elgin, J. & E. Railway v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). Such disputes are entrusted exclusively to arbitration by the National Railroad Adjustment Board (NRAB). 45 U.S.C. § 153, First. A district court has no jurisdiction over such disputes, and thus a party may not obtain a status quo injunction. *Carbone*, 645 F.2d at 98.[5]

■■■ Our task, then, is to determine whether the disagreements in this case were unilateral attempts to change the contract (major disputes) or were merely disagreements over the meaning or coverage of the contract (minor disputes). *Airlines Stewards and Stewardesses Association v. Caribbean Atlantic Airlines*, 412 F.2d 289, 291 (1st Cir.1969). If the railroad acted in a manner it admitted was not in conformity with the existing agreement, a major dispute would be found; the same result obtains when the railroad's claimed justification has no reasonable basis in the contract. *Southern Railway v. Brotherhood of Locomotive Fire & Engineers*, 384 F.2d 323, 327 (D.C.Cir.1967). When, however, the "railroad asserts a defense based on the terms of the existing collective bargaining agreement, the controversy may not be termed a 'major' dispute unless the

---

**3.** The terms "major" and "minor" are not contained in the RLA, but were articulated by the United States Supreme Court to differentiate two types of disputes described in the Act, which have distinct avenues of relief. *Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1944).

**4.** When a party wishes to make changes in "agreements affecting rates of pay, rules or working conditions," it must serve a written "Section 6 Notice", which initiates a lengthy process of negotiation and mediation that the parties must follow. Pending the exhaustion of

all mandated procedures, the carrier is precluded from altering the status quo and the union is prohibited from striking. 45 U.S.C. § 156. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

**5.** A carrier may therefore continue to apply its interpretation of the agreement during the pendency of a minor dispute and no strikes are permitted. *See United Transportation Union v. Penn Central Transportation Co.*, 505 F.2d 542 (3d Cir.1974).

claimed defense is so obviously insubstantial as to warrant the inference that it is raised with intent to circumvent the procedures prescribed by § 6 for alteration of existing agreements." *Id.* In short, if the dispute is arguably a question of interpretation or application of the contract, the court must defer to the expertise of the NRAB and decline to exercise jurisdiction. *REA Express, Inc. v. Brotherhood of Railway, Airline and Steamship Clerks,* 459 F.2d 226, 231 (5th Cir.1972).

■ Brotherhood contends that B & M's operational changes present "major" disputes, entitling it to a status quo injunction from the federal court. In Count I of its complaint, Brotherhood challenged B & M's abrogation of a 1968 collective bargaining agreement applicable to the unit coal train route from Mechanicville to Concord. Since 1968, employees assigned to this route worked under conditions and rates of pay established by the 1968 agreement, whose conditions were more favorable than those in the general collective bargaining agreement. When the NES lease became effective, the coal trains no longer ran from Mechanicville to Concord, but instead ran from Mechanicville to Bow, five miles south of Concord. B & M indicated that Brotherhood employees on that route would now work under the conditions in the general collective bargaining agreement. B & M defended this action by reference to the 1968 agreement, asserting that the agreement did not apply to the new route because it expressly covered trains operating "between Mechanicville, New York and *Concord,* New Hampshire". (emphasis added).[6]

Brotherhood argues that B & M has abrogated the 1968 collective bargaining agreement by not applying it to employees on the Mechanicville-to-Bow route. According to Brotherhood, this abrogation constitutes a unilateral change in the major conditions of employment. It further claims that B & M's contract defense, that the 1968 agreement only applies to trains between Mechanicville and Concord, is not arguably justified by the terms of that agreement. The pay and working conditions have changed but the route remains essentially the same. Unit coal trains still travel from from Mechanicville to Bow; after reaching Bow, the trains are now taken one mile south for work and the crew is taken ten miles south for rest, instead of the trains and crew being taken five miles north to Concord.

We note, as did the district court, that Brotherhood's argument that the 1968 agreement effectively has been made inoperable is not without some merit. As a result of the lease, no unit coal train employees will work on a Mechanicville to Concord route, and thus no employee will be eligible for the more favorable pay and working conditions available under the 1968 agreement.

■ Our task, however, is not to arbitrate this dispute, but to determine if "it is even arguable that" the railroad's action was warranted by the contract. *Carbone v. Meserve,* 645 F.2d 96, 98–99 (1st Cir. 1981). B & M has asserted a defense based on the express terms of the existing collective bargaining agreement. The defense is not so obviously insubstantial as to warrant the inference that it is raised with intent to circumvent the procedures prescribed by § 6 for alteration of existing agreements. *See Southern Railway,* 384 F.2d at 327. *See also REA Express, Inc.,* 459 F.2d at 231. Thus, the controversy may not be termed a major dispute.

In Count II, Brotherhood argues that a major dispute exists with regard to the EDCO/COED route and the switching as-

**6.** Brotherhood argues that the unit coal train had previously stopped short of Concord, yet crews had been paid according to the 1968 agreement. B & M responds that such instances averaged fewer than one per year and were due largely, if not entirely, to emergencies such as train blockages. These arguments demonstrate a dispute as to the application of the 1968 agreement and are best left to the NRAB. *See Maine Central Railroad v. United Transportation Union,* 787 F.2d 780, 782 (1st Cir.1986).

signment at Concord.[7] Brotherhood employees are no longer employed on the New Hampshire Lines portion of the EDCO/COED route; their duties are now performed by NES employees. This change has resulted in a reduction in the mileage of the EDCO/COED assignment for Brotherhood employees and a corresponding reduction in pay. The switcher assignment at Concord was abolished and the duties are now performed by NES employees. Brotherhood charges that these changes raise a major dispute under the RLA, because they constitute a unilateral action by the railroad not based on the existing agreement or past practice, thus constituting a question as to the formation of a new agreement. We agree.

■ In defending an operational change as not raising a major dispute, a carrier is not limited to the collective bargaining agreement to show the basis for its action. The Supreme Court has stated that the carrier can rely on "those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement." *Detroit & Toledo Shore Line Railroad v. United Transportation Union,* 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). The Supreme Court has made clear that for a past practice to be considered an "actual, objective working condition[ ]", it must have occurred "for a sufficient period of time with the knowledge and *acquiescence* of the employees to become in reality a part of the actual working conditions." *Id.* at 154, 90 S.Ct. at 301 (emphasis supplied). Accordingly, in an opinion of this court also published today, we found a minor dispute where the carrier could identify "instances of past practice *accepted by the unions* which, arguably, could support its contention". *Maine Central Railroad v. United Transportation Union,* 787 F.2d 780, 782 (1st Cir.1986).

B & M cannot meet even this minimal burden. It concedes that its action has no basis in the agreement but correctly identifies instances of past practice that could, arguably, support its contention. Fatal to B & M's argument, however, is its admission that the instances were not "accepted by the unions", but were contested each time. Thus, we find that B & M's operational changes as identified in Count II constituted "an attempt to acquire a set of totally new 'rights for the future,' which must be processed as a major dispute before it can be effected." *Id.* at 797 (quoting *Carbone v. Meserve,* 645 F.2d 96, 98 (1st Cir.1981).

Our conclusion that the district court erred in finding that the dispute in Count II was minor does not the end of the matter. Appellee presents this court with an alternative basis for affirming the district court's decision. B & M argues, as it did below, that if the dispute is major, the district court lacked jurisdiction to preserve the status quo because B & M is exempted under § 11341(a) of the ICA from the requirements of the RLA with respect to major disputes. We now turn to that argument.

### III.

■ B & M argues that the district court lacked jurisdiction to consider Brotherhood's request for relief in Count II because the claim was in essence a collateral attack on the ICC order. Judicial review of ICC orders is limited to an action brought pursuant to 28 U.S.C. §§ 2321 and 2342, and is exclusively within the jurisdiction of the courts of appeals; the district court has no jurisdiction over such an action.

■ In the Staggers Rail Act of 1980 (Staggers Act), which reduced governmental economic regulation of the nation's railroads, Congress broadened the ICC's authority to exempt a carrier, service, or transaction from regulation. 49 U.S.C. § 10505 (1982). *See* Note, *Fine-Tuning*

7. The district court did not discuss this count in its opinion, but it dismissed the entire com-

plaint for want of jurisdiction.

*Deregulation: The Interstate Commerce Commission's Use of Its General Rail-Exemption Power*, 53 Geo.Wash.L.Rev. 827, 827–28 (1985).[8] The exemption authority extends to any of the statutory provisions regulating railroads, including the RLA. The exemption provision explicitly provides that "[a] carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and *from all other law*, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction." 49 U.S.C. § 11341(a) (emphasis added). Thus, the ICC has the power to approve a transaction and exempt its participants from legal obstacles that would impede its fruition. *Brotherhood of Locomotive Engineers v. Interstate Commerce Commission*, 761 F.2d 714, 717 (D.C.Cir.1985), *cert. granted*, —— U.S. ——, 106 S.Ct. 1457, 89 L.Ed.2d 714 (1986); *Missouri Pacific Railroad v. United Transportation Union*, 580 F.Supp. 1490, 1501 (E.D.Mo.1984), *aff'd* 782 F.2d 107 (8th Cir.1986).

Brotherhood argues that even if the ICC has the power to exempt a carrier from RLA regulation, it did not exercise its power in this case. We are not persuaded. The ICC considered one union's objection to exempting the lease from regulation, as well as several unions' request that, if the exemption were granted, labor protective benefits be improved. The ICC stated:

"[The union][9] filed a petition requesting denial of the exemption.... [The union] states that B & M did not negotiate with it as to any of the terms and conditions of the proposal that relate to their collective bargaining agreements. It argues that the proposal will cause irreparable

harm to the rail employees that it represents and that the labor protective conditions usually imposed in such instances will not satisfy the requirements of rail labor on the B & M properly represented by [the union]. [The union] also argues that those conditions would negate the terms and conditions of the collective bargaining agreements and are contrary to the legal seniority rights that it has achieved. Thus, the union contends, any Commission action in this matter is contrary to and, therefore, barred by [the RLA].

We are required by 49 U.S.C. 11347 to impose protective conditions for employees who are affected by this type of proposal, and we have developed appropriate conditions to provide the required level of protection. [The union] has not shown how these conditions negate the terms of the collective bargaining agreements or are contrary to seniority rights. The conditions provide the basic level of protection and do not supercede the more extensive protection that may be agreed on through collective bargaining. Finally, the provisions of [the RLA] do not contain language precluding this Commission from acting on rail matters coming within our exclusive and plenary jurisdiction."

Later in its order, the ICC states:

"Brotherhood of Locomotive Engineers request[s] the imposition of labor protective conditions. Under 49 U.S.C. 10505(g), we may not relieve a carrier of its obligation to protect employees. In transactions involving leases and contract [sic] to operate, the Commission has determined that those employee protective conditions in *Mendocino Coast Ry., Inc.—Lease and Operate*, 354 I.C.C. 732 (1978), as modified at 360 I.C.C. 653

---

**8.** The ICC must issue an exemption if it finds first, that continued regulation is unnecessary to carry out the national transportation policy, and second, that either the transaction or service is of limited scope or that application of the statute's regulatory scheme is unnecessary to protect shippers from the railroads' abuse of market power. 49 U.S.C. § 10505(a). In the instant

case, the ICC made favorable determinations on both factors described above.

**9.** The ICC order reveals that the United Transportation Union (UTU) opposed the exemption, and UTU, Brotherhood, and the Railway Labor Executives' Association sought the imposition of labor protective benefits.

(1980), satisfy the statutory requirements under 49 U.S.C. 11347."

The substantive benefits provided under *Mendocino Coast* are extensive. For example, dismissed employees receive an allowance of full wages and benefits for up to six years. Employees displaced to lower paying jobs receive a displacement allowance equal to the difference between their present and future earnings. The provision of these benefits clearly anticipates that employees will be adversely affected by the transaction, and it seeks to eliminate or minimize that burden.

Procedurally, the conditions of *Mendocino Coast* require that a carrier give affected employees at least a twenty-day notice prior to any operational change. The carrier must set forth the changes, including the number of employees expected to be displaced or dismissed. The carrier or union may request negotiations in order to arrive at an implementing agreement. In contrast to the conditions imposed in various types of rail transactions except trackage rights and lease cases,[10] the conditions in lease cases authorize the carrier to proceed with the transaction before an implementing agreement has been reached.[11]

■■■ We also note that the exemption provision, § 11341(a), is self-executing. *Missouri Pacific Railroad*, 580 F.Supp. at 1501 (citing *Order of Railroad Telegraphers v. Chicago and Northwestern Railway Co.*, 314 F.2d 424, 432 (8th Cir.1963). The provision states that "a carrier ... participating in that approved or exempted transaction *is exempt* ... from all other law ... as necessary to let that person carry out the transaction". 49 U.S.C. § 11341(a) (emphasis added).

■■■ On the basis of the the the language of the ICC order, the imposition of *Mendocino Coast* labor protective benefits, and the self-executing nature of § 11341(a), we conclude that the ICC exempted B & M from the conditions of the RLA with respect to major disputes. An order mandating the resumption by B & M of railroad services on the New Hampshire Lines would have reversed the ICC order approving the lease to NES. Further, the imposition of status-quo reemployment would have overturned the ICC order imposing *Mendocino Coast* benefits. Thus, the relief sought by Brotherhood in Count II was, in essence, a collateral attack upon the ICC's order. *See Venner v. Michigan Central Railroad*, 271 U.S. 127, 130, 46 S.Ct. 444, 445, 70 L.Ed. 868 (1926). The district court was without jurisdiction to entertain such a claim. 28 U.S.C. § 2342. *See also Missouri Pacific Railroad*, 580 F.Supp. at 1502.

Brotherhood argues alternatively that, if the ICC did exempt the lease from RLA obligations, it exceeded its authority in doing so because it granted the exemption without providing a reasoned basis for its action. For support, Brotherhood relies on a recent ruling by a divided panel of the D.C. Circuit. *Brotherhood of Locomotive Engineers v. Interstate Commerce Commission*, 761 F.2d 714 (D.C.Cir.1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 1457, 89 L.Ed.2d 714 (1986). In that case, the court held that the ICC exceeded its authority in exempting participants in a rail consolidation from the RLA without specifying any

---

**10.** The conditions imposed in those cases require the carrier to serve a ninety-day notice and require that an implementing agreement be reached between carrier and union *prior* to the implementation of the transaction. *See Oregon Short Line R. Co.—Abandonment—Goshen* (Oregon III), 360 I.C.C. 91 (1979); *New York Dock Ry.—Control—Brooklyn Eastern Dist.* (New York Dock II), 360 I.C.C. 60 (1979).

**11.** When it decided not to impose Oregon III or New York Dock II benefits and conditions in lease transactions, the ICC stated:

"In [lease transactions] we find little justification for extending a blanket imposition of provisions requiring substantially advanced preconsummation notice and finalized preconsummation negotiations with 'interested' employees when possibly there are no substantial number of employees likely to be adversely affected.... Typically, most of these transactions are not opposed by carriers or members of the shipping public and their expeditious consummation would be in the public interest." Mendocino Coast, 30 I.C.C. at 663.

necessity to justify the exemption. The court determined that although Congress gave the ICC broad authority to immunize transactions from legal obstacles, the ICC "must supply a reasoned basis for that exercise of its statutory authority". *Id.* at 723.

The opinion is inapposite to Brotherhood's claim here, where it sought relief pursuant to the RLA in federal district court. The D.C. Circuit issued its ruling on direct review from an ICC order, its jurisdiction based on 28 U.S.C. §§ 2321 and 2342. Had Brotherhood wished to challenge the ICC order as an improper exercise of the ICC's authority, it needed to challenge the order in a suit brought directly to the court of appeals.

For the reasons discussed above, the judgment of the district court is *affirmed.*